# UNITED STATES DISTRICT COURT

FILED
07 OCT 31 AM 11:46
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN _____ DISTRICT OF  CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

831 CAMINITO CANTEBRIA
CHULA VISTA, CA

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: **07 MJ 2575**

DEPUTY

I, Special Agent Leslie C. Tomaich _____ being duly sworn depose and say:

I am a(n) Special Agent for the Drug Enforcement Administration _____ and have reason to believe
            Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A.

in the SOUTHERN _____ District of CALIFORNIA _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of a crime and property used in committing a crime; contraband, fruits of a crime, and things criminally possessed; and propery designed or intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title **21 / 18** United States code, Section(s) **841, 843, 846, 952, 960, 963 / 1956**

The facts to support a finding of probable cause are as follows:

See attached Affidavit of Special Agent Leslie C. Tomaich

Continued on the attached sheet and made a part hereof:    ☑ Yes   ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

October 29, 2007                                    at    San Diego, California
Date                                                       City                              State

William McCurine, Jr.          U.S. Magistrate Judge    _____
Name of Judge                  Title of Judge            Signature of Judge

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

The premises located at 831 Caminito Cantebria, Chula Vista, California is a two story, single family residence. A picture of the residence at 831 Caminito Cantebria, Chula Vista, California is attached hereto. The building is tan stucco with white trim, a Spanish style tile roof, and a white garage door. The black numbers "831" are located on the residence next to the garage door.

The search shall include all rooms, attics, crawl spaces, safes, briefcases, storage areas, containers, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and vehicles located on or near the premises, that are owned or under the control of the occupants of such premises, evidenced by prior surveillance, possession of keys, maintenance paper work, title, insurance papers, or registration for such vehicles in the name of the occupants including the beige Chevrolet Tahoe, bearing California license plate number 5WYN805, and the green Ford Expedition, bearing California license plate number 4VLS686.



# ATTACHMENT B

## ITEMS TO BE SEIZED

1. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

2. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

3. Weapons, firearms, firearms accessories, body armor, and ammunition and documents relating to the purchase and/or possession of such items.

4. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining false identification including birth certificates, drivers license, immigration cards and other forms of identification which the same would use other names and identities other than his or her own.

5. All incoming telephone calls received at the residence during the execution of the search warrant and all calls received on cellular telephones found during the execution of the warrant.

6. Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors and recording devices and cameras.

7. Photographs and video and audio recordings which document an association with other coconspirators and/or which display narcotics, firearms, or money and proceeds from narcotics transactions.

8. Police radio scanners, pagers, cellular telephones, facsimile machines, telephone answering machines, Caller ID system, and prepaid telephone cards.

9. Travel documents including itineraries, airline tickets, boarding passes, motel and hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and receiving documents relating to the delivery of packages.

10. Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records.

11. Records relating to the lease of storage lockers, telephone/address directories and other papers containing telephone numbers and addresses.

12. Records related to the purchase of real estate, vehicles, precious metals, jewelry and other tangible assets.

13. Automotive parts and devices used to create clandestine compartments to hide large quantities of drugs and/or currency.

14. Digital storage devices including: floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magnet optical cartridges, personal digital assistance, pagers, money chips, thumb drives, jump drives, flash drives, portable hard drives and computers containing hard drives. All electronic devices, such as computers, which include the central processing units, internal and external devices, internal and external storage equipment or media, terminals or video display units, together with peripheral equipment, such as keyboards, printers, modems, and programmable telephone dialing devices, and operating system software, program software, applications software, manuals for the software and hardware, electronic organizers, or personal digital assistants and computer discs and CD's, cellular telephones and SIM cards. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

15. With respect to any and all electronically stored information in cellular phones and PDAs, agents may access, record, and seize the following:

    a. telephone numbers of incoming/outgoing calls stored in the call registry;

    b. Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    c. Any incoming/outgoing text messages relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, 963, and money laundering offenses under 18 U.S.C. § 1956;

    d. telephone subscriber information;

    e. the telephone numbers stored in the cellular telephone and/or PDA; and

    f. any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, 963, and money laundering offenses under 18 U.S.C. § 1956.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

UNITED STATES OF AMERICA           )
                                   )   SS
SOUTHERN DISTRICT OF CALIFORNIA    )

I, Leslie C. Tomaich, being duly sworn, declare and state:

1. I make this affidavit in support of an application for a search warrant in furtherance of a narcotics and money laundering investigation conducted by special agents of the United States Drug Enforcement Administration ("DEA") for the premises located at 831 Caminito Cantebria, Chula Vista, California (hereafter the "Target Location") described further in Attachment A.

2. The purpose of the search warrant is to seize (1) property that constitutes evidence of tthe commission of controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, and 963, and money laundering offenses under 18 U.S.C. § 1956, (2) contraband, fruits of crime or things otherwise criminally possessed, and (3) property designed or intended for use or which is or has been used as a means of committing a criminal offense.

3. The information contained in this affidavit is based on my own investigation, oral and written reports by other law enforcement officers, physical and electronic surveillance, court-authorized intercepted calls, interviews with sources of information, subpoenaed and public records, vehicle records from the California Department of Motor Vehicles ("DMV"), database checks, searches, phone analysis, and other investigations. Conversations below are set forth in substance unless noted, and most call descriptions are based on summaries prepared by Spanish-speaking monitors, not final transcripts. My interpretations of coded language are set forth in brackets [] and the interpretations are based on multiple sources of information, the context provided from other calls, and agent experience. The dates and times in this affidavit are approximate. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation.

# I

## EXPERIENCE AND TRAINING

4. I am a Special Agent with the DEA and have been so employed since February 1998. I am presently assigned to the San Diego Field Division. I have received 16 weeks of training at the Drug Enforcement Administration Academy located in Quantico, Virginia, where I became familiar with how controlled substances are consumed, manufactured, packaged, marketed and distributed. I have investigated street-level distributors to large-scale organizations, and I have been involved in a number of undercover investigations. I have used many investigative techniques. For example, I have interviewed and operated numerous informants; I have conducted numerous searches, arrests, interviews, and physical and electronic surveillances; and I have participated in money laundering investigations. I have monitored or overheard numerous calls or meetings between informants or undercover agents and drug traffickers. I have also worked and consulted with numerous law enforcement officers experienced in drug investigations. As a result, I am familiar with how drug traffickers speak to each other and generally conduct business. For example, I am aware that drug traffickers discussing criminal matters over the phone often speak in code or vaguely. This training and experience forms the basis for the opinions expressed below.

# II

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

5. Through my training, experience, debriefings with numerous drug traffickers, and consultation with other DEA special agents and law enforcement officers, I have learned that:

   a. Individuals involved in drug trafficking maintain documents and other records related to their illicit business at their residence. Specifically, individuals involved in drug trafficking often maintain drug ledgers in order to keep track of their share of proceeds, and the purchasing, storage, distribution, and transportation of drugs. Even after the drugs are sold, documentary records and ledgers are often maintained for long periods of time to memorialize past transactions, record the status of the accounts receivable and accounts payable, and maintain the names, telephone numbers, and contact information for suppliers, customers, and co-conspirators. In my experience, residences and premises

2

used by drug traffickers often contain documents and articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

  b. Individuals involved in drug trafficking must often rely on others to obtain their drugs and to help them market the drugs. Frequently, drug traffickers maintain evidence of the identities of these co-conspirators at their residence.

  c. Individuals involved in drug trafficking often store articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

  d. Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their controlled substances. Drug traffickers often maintain these photographs at their residences or in their vehicles. Therefore, I am requesting permission to search the residences listed within this warrant and it's attachment(s) for and to seize photographs that law enforcement agents determine to be of evidentiary value.

  e. Individuals involved in drug trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer, and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate businesses; hiding money in their homes, safes, and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences of individuals involved in drug trafficking.

  f. Individuals involved in drug trafficking often keep and maintain large amounts of bulk United States currency at their residence. Such funds are often used for everyday expenditures and to maintain and finance their ongoing drug business. Additionally, individuals involved in drug trafficking often amass and maintain assets at their residence which were generated by their drug trafficking activities, or purchased with the cash earned from such drug trafficking.

3

      g.     Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their persons or in their residence. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs. Furthermore, I am aware of instances in which drug traffickers have maintained such items in their residences in order to protect themselves and guard their drugs and drug profits, as well as for enforcement purposes during their drug dealings.

      h.     Individuals involved in drug trafficking use cellular telephones, personal digital assistants (PDAs), and pagers and maintain these items on their person and/or in their residences. Drug traffickers use cell phones, PDAs, and pagers to increase their mobility, coordinate illicit activities, and to provide the drug traffickers with instant access to phone calls and voice messages. The cell phone enables drug dealers to maintain contact with drug associates, drug suppliers, and drug customers. Cellular telephones and PDAs contain wire and electronic data concerning telephonic contact, text messages, and electronic mail messages with co-conspirators, as well as telephone books containing contact information for co-conspirators. Members of drug trafficking and distribution organizations also utilize cell phones and PDAs with photograph and video capabilities to take photographs and videos of other members of drug trafficking and distribution organizations, drugs, money, and assets purchased with drug proceeds. Members of drug trafficking and distribution organizations also utilize cell phones, and PDAs with photograph and video capabilities to take photographs and videos of other members of drug trafficking and distribution organizations, drugs, money, and assets purchased with drug proceeds.

      i.     Individuals engaging in drug transportation often use computers to communicate with co-conspirators by means of electronic mail ("e-mail"), for the storage of records such as drug transactions, drug proceeds or assets, contact information for co-conspirators, customers, and suppliers, and to maintain digital photographs, and/or audio and video recordings related to drug transactions. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives, floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magneto optical cartridges, personal digital assistance, pagers, money chips, thumb drives, flash drives, and portable hard

4

drives. Therefore, I am requesting permission to seize computers, including printers, monitors, keyboards, scanners, and all forms of media storage that may be found at the residence.

j. Individuals involved in drug trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and usually maintain these items on their person and/or their residence.

k. Individuals involved in drug trafficking often drive vehicles that are registered in the names of other people and use these vehicles to store and transport narcotics and bulk United States currency.

6. It is also my opinion and belief that the above-described documents and equipment are permanently possessed by drug traffickers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents and equipment are kept by drug traffickers whether or not the trafficker is in possession of any drugs at any given moment. I believe that the seizure of such documents and equipment will provide evidence of the events set forth in this affidavit and that such documents can be found in the residence despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

## III

## FACTS ESTABLISHING PROBABLE CAUSE

7. In November 2006, the DEA began investigating the methamphetamine trafficking activities of Eduardo Barajas, Victor Ramos, and their associates. The Barajas/Ramos methamphetamine trafficking group is primarily made up of street gang members, with several members coming from the Shelltown 38th Street Gang, and others with ties to the Mexican Mafia prison gang. During this investigation, DEA special agents obtained court-authorized federal wiretaps for telephones used by Eduardo Barajas and Victor Ramos. Based on intercepted calls, surveillance, and statements by sources of information, the Barajas/Ramos group distributed at least 25 pounds of methamphetamine over a year period. The investigation also revealed that Julio Cesar Jiminez was an associate of the Barajas/Ramos group.

8. Julio Cesar Jiminez, aka "Foo Foo," is an associate of the Shelltown 38th Street gang. Jiminez is currently 32 years old and has no known criminal convictions.

Intercepted Calls and Surveillance

9. As discussed further, between February 7, 2007 and April 27, 2007, DEA special agents intercepted over 40 pertinent calls involving Jiminez's methamphetamine activity and conducted numerous surveillances involving Jiminez.

10. Based on intercepted calls, DEA agents were able to observe Jiminez pick up money from Barajas on three separate occasions – February 13, 2007, February 22, 2007, and March 1, 2007 – for what appear to be at least one-pound methamphetamine transactions.

11. On March 5, 2007, agents intercepted several calls between Barajas and Ramos indicating that Ramos was supposed to pick up one half pound of methamphetamine from Jimenez at Jimenez's residence. Agents established surveillance in the area of Jimenez's previous residence of 364 Kingswood Street, San Diego, California. Agents observed Ramos arrive at Jimenez's residence driving a silver Mercedes bearing California license plate 5WKL002. Agents observed Ramos enter Jimenez's residence. During the time Ramos was inside Jimenez's residence, a call was intercepted between Barajas and Ramos. Barajas wanted to know if the methamphetamine was the correct quantity. Ramos told Barajas that he would check the weight of the methamphetamine later. Moments later, agents observed Ramos exit Jimenez's residence and depart the location in the silver Mercedes. Later that evening, Jimenez called Barajas and informed Barajas he was going to come over to Barajas' residence to pick up the money for the methamphetamine that Jimenez gave to Ramos. Shortly after this call was intercepted, agents observed Jimenez arrive at Barajas' residence in a green Ford Expedition bearing California license plate 4VLS686. An inquiry with the California DMV revealed that the registered owner of the Ford Expedition was Julio Jimenez and Jose Jimenez of 364 Kingswood Street, California. As of October 2007, the above referenced Ford Expedition bearing California license plate 4VLS686 is registered to Julio Jimenez and Jose Jimenez of 831 Caminito Cantebria, Chula Vista, California.

12. During March 28, 2007 and March 29, 2007, agents intercepted multiple calls between Jiminez and Ramos regarding the sale of a firearm. Ramos (an illegal alien) indicated that he wanted to purchase a gun from Jiminez on behalf of an unidentified male for $250. Jiminez told Ramos that the firearm was "clean" and that Ramos did not have to worry that the gun was used in the past for any shootings. Later that evening, agents observed a meeting between Ramos and Jiminez at Ramos' residence. Moments after agents observed Jiminez depart Ramos' residence, a call was intercepted between Ramos and the unidentified male. Ramos told the unidentified male that the gun had arrived and the unidentified male could come to Ramos' residence, and pick the gun up.

13. On April 4, 2007, agents intercepted a call between Jiminez and Barajas where Jiminez asked Barajas whether he (Barajas) had any methamphetamine. Barajas told Jiminez that he had just received some. Jiminez asked Barajas if he could get one. Barajas told Jiminez that he had to run some errands and he could deliver it to Jiminez. Jiminez told Barajas to deliver it to Jiminez's house.

14. Based on intercepted calls, on April 5, 2007, Jiminez and Barajas were involved in a transaction involving 1 ½ ounce of methamphetamine.

15. On April 10, 2007, agents intercepted a call between Jiminez and Barajas regarding methamphetamine. Barajas called Jiminez and asked where Jiminez was. Jiminez told Barajas that he just left his house. Jiminez told Barajas that he got rid of the half [half ounce of methamphetamine] and wanted seven more [seven grams of methamphetamine]. Jiminez told Barajas to leave the methamphetamine in Jiminez's mailbox.

Sources of Information

16. Agents have interviewed multiple sources of information who have corroborated Jiminez's methamphetamine trafficking activity. The sources of information have criminal histories that include arrests and/or convictions for felony narcotics trafficking offenses, firearm convictions, accessory, misdemeanor offenses, and traffic offenses. Agents have found the information provided by the sources of information to be substantially reliable and corroborated by other information.

17. One source of information (hereafter referred to as "SOI-1") stated that he/she has known Jiminez for several years. SOI-1 said Jiminez had purchased ounce quantities of methamphetamine from SOI-1 on numerous occasions over the years. SOI-1 said Jiminez introduced SOI-1 to a

1  methamphetamine source of supply who SOI-1 had purchased pound quantities of methamphetamine
2  from on a regular basis. SOI-1 stated that Jimenez was a courier for that source of supply.
3      18. Another source of information (hereafter referred to as "SOI-2") said that he/she has
4  known Jimenez for several years. SOI-2 said Jimenez was Shelltown 38th Street gang member.
5      19. On September 17, 2007, agents interviewed a third Source of Information, hereafter
6  referred to as SOI-3. SOI-3 said he had delivered small amounts of methamphetamine to Jimenez at
7  Jimenez's residence on several occasions over the past year. SOI-3 said Jimenez would often come to
8  Barajas' house to pick up money for methamphetamine.
9      20. Throughout this investigation, Jimenez has been observed at 831 Caminito Cantebria,
10 San Diego, California, as recently as October 17, 2007. An account with San Diego Gas & Electric for
11 831 Caminito Cantebria, San Diego, California, is registered to Julio Jimenez. An inquiry with the
12 United States Postal Service reveals that Julio Jimenez and his wife, Tina Marie Jimenez, forwarded
13 their mail from 364 Kingswood Street, San Diego, California to 831 Caminito Cantebria, Chula Vista,
14 California.

15 <u>Vehicles Associated with Jimenez and 831 Caminito Cantebria</u>

16     21. On several surveillances, agents have observed Jimenez driving two different vehicles,
17 both of which have been previously observed at 364 Kingswood Street, San Diego, California. In
18 particular, on February 13, 2007 and February 22, 2007, agents observed Jimenez arrive at Barajas's
19 residence in a beige Chevrolet Tahoe, bearing California license plate number 5WYN805, to pick up
20 money from Barajas for methamphetamine Barajas had purchased. An inquiry with the California DMV
21 revealed the registered owner to be Maria or Ramon Retamoza of 581 Lisbon Street, Perris, California.
22     22. On March 1, 2007, agents observed Jimenez arrive at Barajas' residence in a green Ford
23 Expedition, bearing California license plate number 4VLS686, to pick up money from Barajas for
24 methamphetamine Barajas had purchased. An inquiry with the California DMV at the time of the
25 surveillance revealed the registered owner to be Julio Jimenez and Jose Jimenez of 364 Kingswood
26 Street, California. As of October 2007, the above referenced Ford Expedition bearing California license
27 plate number 4VLS686 is registered to Julio Jimenez and Jose Jimenez of 831 Caminito Cantebria,
28 Chula Vista, California.

## IV

## SEARCH PROTOCOL FOR COMPUTERS

23. This section describes the procedures that will be employed during this search to minimize the intrusion represented by the search of any electronic data found at the target location.

24. Searching agents will be asked to use an incremental approach in searching for relevant electronic material. If the agents are able to examine relevant portions of computer drives to identify responsive material within a reasonable time period on-site, then the agents will attempt to create forensic images of computers or laptops seized. However, if the agents cannot perform the search within a reasonable period on-site, will they employ alternate procedures to complete the review off-site. In that case, the computer expert will create forensic images of electronic data sources as necessary to complete the search off-site.

25. A forensic image is an exact physical copy of a computer hard drive or other similar electronic storage media. A forensic image thus captures all of the data on the hard drive (or other media) without the data being viewed and without changing the data in any way. There are many reasons why it is not feasible to conduct a forensic analysis of data on-site. First, analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. Second, there are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user's computer system. Third, it is only after a thorough examination and analysis, that a trained computer forensic examiner can determine whether he needs to obtain specialized hardware or software (not to mention specialized training on the specialized software) in order to view and analyze the data contained in electronic form.

26. The analysis of data on a computer may also be an extremely tedious and time consuming process. In addition, to requiring special technical skills, equipment and software, it may take days to properly search a single hard drive for specific data. With current technology, each search "hit" must be reviewed in its context by an agent to determine whether the data is within the scope of the warrant. In other words, merely finding a good "hit" does not end the review process.

27. Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has increased. For example, a single gigabyte of storage space (i.e., 1,000 megabytes) is the equivalent of 500,000 double-spaced pages of text. Computer hard drives capable of storing 100s of gigabytes of data are becoming quite common in newer desktop computers.

28. In addition to the sheer volume, the data may be stored in a variety of formats or encrypted. The volume of data of course extends the time that it takes to analyze the image in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Moreover, certain file formats do not lend themselves to keyword searches (e.g., many common electronic mail, database and spreadsheet applications do not store data as searchable text).

29. Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may require off-site analysis.

30. Nevertheless, all forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant. In the course of proper examination, the forensic examiner may view information that is potentially privileged or not within the scope of the warrant. If so, this information will not be made available to the investigating agents unless it appears to the examiner that the information relates to the commission of offenses not covered by this warrant. In that event, the examiner will confer with the investigator and/or the prosecuting attorney so that they can determine whether to seek a further search warrant for the newly uncovered data.

31. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

## V

## SEARCH PROTOCOL FOR CELLULAR TELEPHONES AND PDAS

32.     With respect to any and all electronically stored information in cellular phones or PDA at the target locations, agents respectfully request that this Court authorize the agents to access, record, and seize the following:

    a.     telephone numbers of incoming/outgoing calls stored in the call registry;

    b.     Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    c.     Any incoming/outgoing text messages regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, 963, and/or 18 U.S.C. § 1956;

    d.     telephone subscriber information;

    e.     the stored telephone numbers dialed from the cell phone and/or PDA; and

    f.     any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, 963, and/or 18 U.S.C. § 1956;.

33.     If the agents cannot analyze the cellular telephone or PDA on site, they may send the cellular telephone or PDA to the Regional Crime Forensic Lab (RCFL) or the DEA Digital Lab to all analysts or forensic examiners to examine, analyze, and make a record of the contents of the information stored in the seized cellular telephone or PDA.

## VI

## CONCLUSION AND SEALING REQUEST

34.     Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts and opinions set forth in this affidavit, there is probable cause to believe that federal crimes have been committed, including controlled substances violations under 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, 963, and money laundering violations under 18 U.S.C. § 1956.  There is also probable cause to believe that property constituting evidence of the offenses, contraband, fruits of crime or things otherwise criminally possessed, and property designed or intended

1  for use or which is or has been used as a means of committing the criminal offenses will be found in the
2  target location described further in Attachment A.
3          35.     Because this is an ongoing investigation and premature disclosure of the investigation
4  could endanger agents and officers, cause the target subjects and others to flee and cause destruction of
5  evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all
6  other associated court records be sealed until further court ordered.
7          I declare under penalty of perjury that the foregoing is true and correct.
8                                                  LESLIE C. TOMAICH
                                                   Special Agent
9                                                  Drug Enforcement Administration

10
11  Sworn to and subscribed before me
    this  29th   day of October, 2007.
12
13  HONORABLE WILLIAM MCCURINE, JR.
14  United States Magistrate Judge